**Abdallah G. BSEIRANI, AGB International Management Corporation, and Pittcon Preinsulated Pipes Corporation, Plaintiffs,**

v.

**George T. MAHSHIE, Defendant.**

**No. 85–CV–1337.**

United States District Court, N.D. New York.

March 2, 1995.

Hancock & Estabrook, Syracuse, NY (David E. Peebles, of counsel), for Abdallah G. Bseirani, AGB Intern. Management, & Pittcon Preinsulated Pipes.

Smith, Sovick, Kendrick, Schwarzer & Sugnet, P.C., Syracuse, NY (James D. Lantier, of counsel), for George T. Mahshie.

### MEMORANDUM–DECISION & ORDER

MUNSON, Senior District Judge.

Presently before the court are post-trial motions by plaintiffs Abdallah Bseirani, AGB International Management Corporation and Pittcon Preinsulated Pipes Corporation ("plaintiffs" or "Bseirani parties"), and defendant George T. Mahshie. The motions were presented orally to the court on November 9, 1994.

### THE FACTS

The instant action stems from a failed business relationship between Ismail Abou–Khadra and Abdallah G. Bseirani involving the manufacture and sale of heating, ventilation and air conditioning equipment and preinsulated pipes. The relationship commenced in late 1978 when the two were introduced by defendant George T. Mahshie, and continued until the early 1980's when the parties had a falling out over the operation and control of two companies, Contractors Services Establishment ("CSE") and Saudi Preinsulated Pipes Industries ("SPPI").[1]

At the core of this case are Bseirani's allegations that Mahshie and Abou–Khadra defrauded him out of his forty-nine percent equity interest in CSE and SPPI. In the late 1970s, Bseirani became interested in selling heating, ventilating and air conditioning equipment in Saudi Arabia, but as an American citizen was prohibited under Saudi law from doing so unless sponsored by a Saudi entity. In November 1978 George Mahshie introduced Bseirani to Ismail Abou–Khadra, a Saudi citizen. Abou–Khadra established CSE, a Saudi Arabian corporation, in 1975. In 1978 CSE was dormant, and Abou–Khadra expressed an interest in allowing Bseirani to conduct his import business under its auspices. Bseirani and Abou–Khadra agreed to operate CSE as joint owners, and did so until December 1983, when Abou–Khadra allegedly confiscated the company from Bseirani.

Meanwhile, in 1979 Bseirani discussed with Abou–Khadra the possibility of operating a manufacturing plant within Saudi Arabia. Again limited by Saudi business laws, Bseirani agreed to allow the facility to be listed in Saudi Arabia as a sole proprietorship under Abou–Khadra's name. The business was named SPPI. Abou–Khadra and Bseirani orally agreed, after extensive negotiations often facilitated by Tony Deeb, to an initial one million dollar capitalization of SPPI. Bseirani asserts that each agreed to hold a forty-nine percent equity interest in SPPI, with Mahshie holding the remaining two percent.[2] Mahshie denies having any ownership interest in the company.

According to Bseirani, he gave a $500,000 check to Tony Deeb, who passed it to Abou–Khadra. The check represented Bseirani's ownership interest in SPPI, and was deposited into SPPI's account in February, 1982. Later that year, Bseirani initiated steps to formalize his interest in SPPI because Abou–

---

1. For a more complete recitation of the relevant facts, *see Abou–Khadra v. Mahshie,* 4 F.3d 1071 (2d Cir.1993).

2. Many of Bseirani's dealings were undertaken through AGB International Management Corporation, a New York corporation he founded to represent the interests of American manufacturers of heating and ventilation equipment in the Middle East. Bseirani also established Pittcon Preinsulated Pipes Corporation ("Pittcon"), to which he transferred the patent and trademark rights to a certain preinsulated pipe. Pittcon later transferred those rights to SPPI. Although both AGB and Pittcon are plaintiffs, for ease of discussion the court refers primarily to Bseirani throughout this Memorandum–Decision and Order.

Khadra never provided him with a receipt indicating that the $500,000 was his capital contribution to the company. By the time the first shipment of manufactured goods issued from SPPI in November 1983, the relationship between Bseirani and Abou–Khadra had significantly deteriorated. Bseirani claims that Abou–Khadra refused to honor Bseirani's continued requests to formalize Bseirani's interest in SPPI. Instead, Abou–Khadra dismissed Bseirani as general manager of SPPI, and revoked his work visa, forcing Bseirani to leave Saudi Arabia.

On March 7, 1984, after further negotiations, Bseirani and Abou–Khadra executed two release agreements. The first agreement purported to satisfy all potential legal claims between the parties. The second set forth the terms of the continued operation of SPPI. By October 1984, however, whatever cooperative spirit these releases signified had dissipated. Claiming that Bseirani failed to abide by the terms of the second agreement, Abou–Khadra directed Mahshie to withhold payment to Bseirani due under the first agreement.

### PROCEDURAL HISTORY

Bseirani brought an action against Mahshie in state court for the release of the funds. Abou–Khadra then commenced suit in this court against a variety of defendants, including Bseirani and Mahshie. The state court action was settled, and Bseirani asserted seventeen counterclaims against Abou–Khadra, Mahshie and Deeb in the federal action.

The federal jury returned a general verdict supplemented by answers to eighty-eight special interrogatories. The jury found against Abou–Khadra on his claims against Bseirani, and for Bseirani on a number of the causes of action in his counterclaims. The

jury also found for Bseirani on his claims against George Mahshie for fraud, conspiracy to defraud, civil RICO violations, breach of a duty of honesty and fair dealing, breach of fiduciary duty, conversion, and legal malpractice. On appeal, the Court of Appeals for the Second Circuit reversed and remanded for a new trial on Bseirani's claims against Mahshie. *See Abou–Khadra v. Mahshie*, 4 F.3d 1071 (2d Cir.1993).

A second trial commenced on October 3, 1994. Instead of seventeen causes of action, Bseirani pursued only four: state common law claims of fraud and malpractice, and two violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1962(d).[3] Rather than eighty-eight special interrogatories, the jury was provided with a special verdict form consisting of eighteen questions, prepared and agreed to by the parties. The jury answered the eighteen questions as follows:

1. Did defendant Mahshie conspire to defraud, and therefore defraud, Abdallah B. Bseirani into believing that he was the true owner of CSE and/or the owner of a 49% interest in SPPI?

   Answer: Yes.

2. If your answer to the previous question is "yes", do you find that plaintiffs suffered damages which were proximately caused by the fraud?

   Answer: Yes.

3. If your answers to questions "1" and "2" above are "yes", state the amount of damages that you find resulted from the fraud.

   Answer: $237,500.00.

4. If your answers to questions "1" and "2" are "yes", do you find that plaintiffs

---

**3.** To commit a "d violation" under 18 U.S.C. § 1962(d), one must conspire to commit an "a", "b" or "c" violation under the same subsection. In this case plaintiffs claimed that defendant conspired to commit a "b" and "c" violation, thereby twice committing a "d violation."
  Subsection 1962(b) provides that:
    It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or

control of any enterprise which is engaged in, or the activities which affect, interstate or foreign commerce.
  Subsection 1962(c) provides that:
    It shall be unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

are entitled to punitive damages against Mahshie as a result of the finding of fraud?

Answer: Yes. $475,000.00

5. Did defendant Mahshie conspire with Ismail Abou–Khadra to acquire from Abdallah G. Bseirani a 49% interest in SPPI through a pattern of racketeering activity?

Answer: Yes.

6. If your answer to question "5" is "yes", did plaintiffs suffer damages which were proximately caused by the conspiracy?

Answer: Yes.

7. If your answers to questions "5" and "6" are "yes", what amount of damages did plaintiffs suffer as a result of the conspiracy?

Answer: 237,500.00.

8. Did defendant Mahshie conspire with Ismail Abou–Khadra to conduct the operation of the Bseirani/Abou–Khadra business venture through a pattern of racketeering activity?

Answer: Yes.

9. If your answer to question "8" is "yes" did plaintiffs suffer damages which were proximately caused by the conspiracy?

Answer: Yes.

10. If your answers to questions "8" and "9" are "yes", what amount of damages did plaintiffs suffer as a result of the conspiracy?

Answer: 237,500.00.

11. Do you find that defendant Mahshie committed legal malpractice toward Abdallah G. Bseirani, Pittcon Preinsulated Pipes Corporation and/or AGB International Management Corporation?

Answer: Yes.

12. If your answer to questions "11" is "yes", did plaintiffs suffer damages which were proximately caused by the malpractice?

Answer: Yes.

13. If your answers to questions "11" and "12" are "yes", what amount of damages do you find were caused by defendant Mahshie's malpractice?

Answer: $237,500.00.

14. If your answers to questions "11" and "12" are "yes", do you find that plaintiffs are entitled to punitive damages against defendant Mahshie as a result of your finding of malpractice?

Answer: Yes. $475,000.00.

15. Of the amount, if any, awarded in your answer to question "3", how much was included in the amounts awarded in your answers to questions "7", "10", and "13"?

Answer: None.

16. Of the amount, if any, awarded in your answer to question "7", how much was included in the amounts awarded in your answers to questions "3", "10", and "13"?

Answer: None.

17. Of the amount, if any, awarded in your answer to question "10", how much was included in the amounts awarded in your answers to questions "3", "7", and "13"?

Answer: None.

18. Of the amount, if any, awarded in your answer to question "13", how much was included in the amounts awarded in your answers to questions "3", "7", and "10"?

Answer: None.

Special Verdict Form, Court Exhibit ("Exh.") 4.

## THE POST–TRIAL MOTIONS

Defendant George Mahshie now moves pursuant to Federal Rules of Civil Procedure 50(b) and 59 for judgment as a matter of law ("j.m.o.l."), or for a new trial or, in the alternative, to limit the judgment to an amount no greater than $237,500. To that end, defendant advances four distinct arguments. First, he argues that the jury's answers to the final four questions on the Special Verdict Form are untenable as a matter of law. According to defendant, the total compensatory award should be limited to $237,500 because each cause of action represented an independent theory of recovery for a single injury. In essence, he argues that the four causes of action were pleaded in the alternative, and that recovery on more than one would be duplicative. Second, defendant ar-

gues that plaintiffs failed to prove at trial the existence of an overall venture beyond the scope of CSE and SPPI. Such a showing was necessary, defendant asserts, in order for the jury to logically find a conspiracy to violate 18 U.S.C. § 1962(c), as it did in response to question number eight on the special verdict form. *See* Court Exh. 4. Third, defendant asserts that there was insufficient evidence of proximate cause to allow recovery under any claim. Finally, he asserts that the RICO statute is unconstitutionally vague.

Plaintiffs cross-move to modify the verdict. They assert that damages flowing from the first, second and third causes of action were fixed in the first trial at $1,930,500, and that the current jury's finding that Mahshie participated in the scheme to defraud plaintiffs mandates that he be liable for the full amount defrauded.

## A. STANDARDS

■ A trial court may grant a post-trial motion for judgment as a matter of law only where, without considering either the credibility of the witnesses or the weight of the evidence, the only result a reasonable juror could have reached is one in favor of the movant. *Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 233 (2d Cir.1991). In deciding such a motion, the court must view the evidence in the light most favorable to the nonmoving party. *Concerned Area Residents For the Env't v. Southview Farm*, 34 F.3d 114, 117 (2d Cir. 1994). The court may grant judgment as a matter of law only where there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture...." *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1046 (2d Cir.1992) (citation omitted).

■ A less stringent standard applies to a motion for a new trial than to a motion for judgment as a matter of law. *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970 (2d Cir.1987). Under Rule 50(b), a motion for a new trial may be joined with a post-trial motion for judgment as a matter of law or requested in the alternative. The decision whether to grant a new trial "is committed to the sound discretion of the court." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993). In deciding a motion for a new trial, the court is "free to weigh the evidence ... and need not view it in the light most favorable to the verdict winner." *Song*, 957 F.2d at 1047. Nonetheless, a new trial is warranted only if the court is convinced that the jury has reached a seriously erroneous result, or that the verdict is against the weight of the evidence, making its enforcement a miscarriage of justice. *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir.1988); *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir.1983).

## B. DEFENDANT'S MOTION

### 1. The Evidence Was Sufficient

The court first addresses those portions of defendant's motions that challenge the sufficiency of the evidence. First, defendant asserts that plaintiffs failed to prove the existence of an overall venture beyond the scope of CSE and SPPI. Second, defendant argues that there was insufficient evidence of proximate cause to allow recovery under any claim.

■ The court is unpersuaded by either of defendant's challenges. Applying the less restrictive standard attendant to a motion for a new trial, the court does not find that the jury reached a seriously erroneous verdict or even a verdict against the weight of the evidence. First, plaintiffs did not need to prove the existence of an enterprise, as that was established in the first trial. All plaintiff needed to do in the second trial to prove the alleged violations under 18 U.S.C. § 1962(d) was demonstrate that Mahshie conspired to "acquire or maintain ... any interest in or control of" that enterprise, 18 U.S.C. § 1962(b), and to "conduct or participate ... in the conduct" of that enterprise. 18 U.S.C. § 1962(c). The jury found that Mahshie did conspire on both counts, *see* Special Verdict Form, Court Exh. 4, Question 5 (conspiracy to acquire) and Question 8 (conspiracy to operate), and sufficient proof was adduced by plaintiffs to justify these findings.

Second, significant proof was developed at trial to show that the damages suffered were a reasonably probable consequence of defendant's unlawful acts. Therefore, the jury's finding of proximate cause is supported by the evidence. Because defendant fails to demonstrate that the verdict was somehow against the weight of the evidence, the court holds that the jury did not render a verdict that was a miscarriage of justice. Hence, in so far as defendant's post-trial motions are based on an argument that the evidence was insufficient to justify the verdict, his motions are denied.

### 2. The Damage Awards Were Not Duplicative

The court next turns to defendant's argument that the damages awarded by the jury are impermissibly duplicative. Simply put, defendant asserts that the four causes of action submitted to the jury were alternative pleadings based on the same set of facts, and therefore that recovery must be limited to a single cause of action.

In response, plaintiffs argue that there is no duplication of compensatory damages. In the alternative, plaintiffs assert that defendant waived his right to object by not doing so before the jury was dismissed. The court addresses each of these arguments in turn.

#### a. Waiver

The Second Circuit has frequently addressed waiver in cases involving challenges based on some logical inconsistency within a verdict. While not directly applicable to the facts of this case, the court finds this line of precedent useful in so far as it elucidates the general principles underlying the doctrine of waiver.

In *Denny v. Ford Motor Co.*, 42 F.3d 106, 110–11 (2d Cir.1994), the court rejected the suggestion that its previous rulings addressing the subject of waiver drew a sharp distinction between cases involving special verdicts under Fed.R.Civ.P. 49(a) and those involving a general verdict accompanied by written answers to interrogatories under Fed.R.Civ.P. 49(b). Instead "a case-by-case application of the familiar principles of waiver" is appropriate regardless of the nature of the verdict form. *Denny*, 42 F.3d at 111.

The "familiar principles" to which the *Denny* Court referred can briefly be summarized. While courts within the Second Circuit do not employ a *per se* waiver rule where a party fails to make a timely objection to an inconsistent jury verdict, such a failure generally "carries some weight" in the court's analysis. *Manes v. Metro–North Commuter R.R.*, 801 F.Supp. 954, 959 (D.Conn.1992). Case law supports the view that a party *may* waive its right to object to answers to a special jury verdict where the objection is not raised before the jury is discharged. *See, e.g., Lavoie v. Pacific Press & Shear Co.*, 975 F.2d 48, 54 (2d Cir.1992); *Haskell v. Kaman Corp.*, 743 F.2d 113, 123 (2d Cir.1984). Waiver is particularly appropriate where counsel is or should be aware of the inconsistency in the verdict, and where resubmission to the jury would resolve the ambiguity, *See U.S. Football League v. National Football League*, 842 F.2d 1335, 1367 (2d Cir.1988), because the purpose of waiver is "to promote the efficiency of trials by allowing the original deliberating body to reconcile inconsistencies without resort to the presentation of evidence to a different body." *Fernandez v. Chardon*, 681 F.2d 42, 58 (1st Cir.), *cert. denied*, 459 U.S. 989, 103 S.Ct. 343, 74 L.Ed.2d 384, (1982) *aff'd*, 462 U.S. 650, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983).

In the instant case, defendant neither objected to the answers returned by the jury nor moved for resubmission to resolve the ambiguity he alleges. As will be demonstrated below, defendant's argument could have been resolved by the jury if defendant had raised his objection before the jury was dismissed.[4] Thus defendant's failure to raise a timely objection deprived the

---

**4.** Had defendant brought his motion at the time the verdict was originally returned, the court could have inquired of the jury whether its awards were, or were not, duplicative. While the answer to this question can be surmised from its responses to questions fifteen through eighteen on the special verdict form, the most effective way to resolve the current dispute would have been to poll the jury.

court and the parties of their most effective and efficient means of resolving the issue of whether their award was duplicative. As defendant's counsel assisted in the preparation and agreed to the content of the special verdict form, he was certainly on notice of the potential that the jury could have responded as it did. Because the underlying considerations which support the waiver doctrine are present in this case, the court holds that defendant has waived his right to a new trial based on the jury's allegedly "untenable" verdict. Defendant has not, however, waived his right to move for judgment as a matter of law on this basis, and the court considers that motion on the merits.

### b. Duplication

■ In arguing that the jury's verdict is "untenable as a matter of law", defendant relies principally on *Conway v. Icahn & Co.*, 16 F.3d 504 (2d Cir.1994) (*"Conway II"*). In *Conway* the plaintiff brought an action for damages against a stock broker who without notice liquidated a portion of plaintiff's account to satisfy a margin call. The plaintiff sued in federal court, setting forth one federal and several pendant state claims. The jury found the defendant liable for negligence, but also found contributory negligence of 48 percent on the plaintiff's part. While the jury assessed damages of $687,000 on the negligence claim, it reduced the sum to $357,-240 to reflect its contributory negligence finding. The jury also assessed $357,240 on plaintiff's claim for breach of fiduciary duty.

By post-trial motion, plaintiff sought to limit the damages to $357,240. The district court granted his motion, holding that the separate awards were based on the same breach of duty, and therefore that the separate awards were duplicative and impermissible as a double recovery. *See Conway v. Icahn & Co.*, No. 89 Civ. 3995, 1993 WL 60025, at *3, 1993 U.S.Dist. LEXIS 2272, at *7 (S.D.N.Y. Mar. 1, 1993) (*"Conway I"*). The Circuit Court affirmed, citing the general principle that "[w]here a plaintiff seeks recovery for the same damages under different legal theories, only a single recovery is allowed." *Conway II*, 16 F.3d at 511 (citing *Wickham Contracting Co. v. Board of Educ.*,

715 F.2d 21, 28 (2d Cir.1983)). Because his theories of recovery were based on a single set of facts, and the economic loss was predicated on those unitary facts, the court reasoned, " 'the verdicts should be identical and a single recovery allowed.' " *Id.*, 16 F.3d at 511 (quoting *Wickham*, 715 F.2d at 28).

The *Conway II* court distinguished the facts before it from those in *Gentile v. County of Suffolk*, 926 F.2d 142 (2d Cir.1991). In *Gentile*, plaintiffs were involved in a brawl with police. The plaintiff sued under state law for malicious prosecution, and also brought a federal claim under 42 U.S.C. § 1983. The jury found damages against the defendants in the amount of $150,000 for each plaintiff, with half of that amount awarded under the state, and half under the federal, cause of action. In addressing defendant's post-trial motion to reduce the damages, the Circuit Court expressly agreed with the proposition that a plaintiff can receive compensation for an item of damages only once, no matter how many theories of recovery he pleads. Nonetheless, the court was not convinced that this principle was violated by the district court, which allowed the verdict to stand. *See Gentile*, 926 F.2d at 153.

Responding to defendants' suggestion that the jury impermissibly compensated each plaintiff twice for identical injuries, the *Gentile* Court concluded that it was

equally conceivable that the jury found that each plaintiff suffered $150,000 worth of discrete, unduplicated injuries as a result of the County's violations of law, and merely split the total amount equally between the state and federal causes of action in announcing their award to the court on the form submitted to it.

926 F.2d at 154. The court found support for this conclusion in the jury's insistence, in response to the court's post-verdict poll, that it intended to award a total of $150,000 to each plaintiff *and that the damages awarded under state law and federal law were "independent."* *Gentile*, 926 F.2d at 154 (emphasis added).

The critical distinction between the facts of *Gentile* and those of *Conway II* was that in the former case it was conceivable that the

jury found that each plaintiff suffered some total amount of unduplicated injuries and merely split that amount among the various claims, whereas in *Conway II*, the court found it inconceivable that the jury split plaintiff's losses between the two claims submitted to it. Like the *Gentile* court, the *Conway II* court analyzed the totality of the trial record in assessing the likelihood that the jury awarded duplicative damages. In *Conway II*, the court found it critical that the damages awarded on plaintiff's breach of fiduciary duty claim equalled those on his negligence claim, even though the former had been reduced due to plaintiff's contributory negligence. Because an award for breach of fiduciary duty could not be reduced for contributory negligence, the court concluded that "the negligence award simply was carried over to the fiduciary claim and an improper duplication resulted." *Conway II*, 16 F.3d at 511.

After analyzing the trial record, the court finds no plausible basis for concluding that duplication of damages occurred. Indeed, the jury specifically addressed the duplication issue in its answers on the special verdict form. Asked how much of its award for each cause of action was also included in the amounts awarded in the other causes of action, the jury replied "none." This is a clear statement by the jury that no duplication existed, and as such is analogous to the jury's response to the trial judge in *Gentile* that its awards were "independent."

Moreover, the specific amount of damages awarded by the jury gives further credence to the conclusion that it intended an aggregate award of compensatory damages in the amount of $950,000 and, by extrapolation, that the jury did not award duplicative damages for a unitary injury. On October 18, 1994, the parties stipulated on the record and before the jury that the amount allegedly confiscated by Abou–Khadra from Bseirani in connection with CSE was $950,000. That stipulation was repeated during the court's charge to the jury. It is certainly conceivable that the jury found that plaintiff was entitled to exactly that amount in damages, and simply split the award over the four claims submitted to it by awarding $237,500 on each. That the aggregated award totals $950,000 seems even less likely to be a coincidence given the fact that the jury's two punitive awards of $475,000 also total $950,000.

Based on these facts the court concludes that this is a case like *Gentile*, where it is likely that the jury found a total amount of discrete, unduplicated injuries as a result of defendant's actions, and split the total equally among the four causes of action submitted to it. As noted by the *Gentile* court, "defendants do not demonstrate that a jury's award is duplicative merely by noting that it allocated the damages under . . . different causes of action." 926 F.2d at 154. While, as in *Gentile*, it is *possible* that the jury committed the error of duplicating damages, defendant has "failed to establish this allegation with any degree of certainty." *Id.*

At oral argument defendant vehemently argued that *Conway II* stands for the proposition that the intent of the jury is immaterial to a determination of whether duplicative damages were awarded. Specifically, defendant points to the comment of the *Conway II* Court that "[r]egardless of the jury's intentions, it is clear that the separate awards were duplicative. . . ." *Conway II*, 16 F.3d at 511. However, defendant misconstrues the meaning of the quoted passage, in which the court merely noted that a jury's intent that plaintiff recover on all claims is irrelevant *if the awards are duplicative*. The statement has nothing at all to do with the court's analysis of whether the award was *in fact* duplicative. Because the *Conway II* court's threshold inquiry revealed that the awards were duplicative, the intent of the jury to aggregate its awards became irrelevant because the awards could not be aggregated as a matter of law.

In contrast, this court finds that defendant has failed to establish with any degree of certainty that the instant jury awards were duplicative.[5] Therefore, in so far as defen-

---

5. Defendant argues that the jury's punitive awards, like its compensatory awards, are illegal because they are duplicative. The court applies

the same analysis to the jury's punitive awards as to its compensatory awards, and holds that the

dant's post-trial motions for a new trial or judgment as a matter of law are based on his argument that the awards are duplicative and hence "untenable as a matter of law", defendant Mahshie's motions are denied.

### 3. RICO is Constitutional

■ Defendant's final argument in support of their motions is that RICO is unconstitutionally vague. Because all other grounds raised in support of defendant's motions are unavailing, the court turns to the merits of his constitutional claim.[6]

■ The genesis of defendant's challenge to the constitutional legitimacy of RICO lies in Justice Scalia's *dicta* in his concurring opinion in *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 256, 109 S.Ct. 2893, 2909, 106 L.Ed.2d 195 (1989). In *H.J. Inc.*, Justice Scalia hinted that a constitutional challenge to RICO might succeed: "No constitutional challenge to this law has been raised in the present case.... That the highest Court in the land has been unable to derive from this statute anything more than today's meager guidance bodes ill for the day when that challenge is presented." 492 U.S. at 255–56, 109 S.Ct. at 2909.

Notably, Justice Scalia's comments were not adopted by the majority in *H.J. Inc.* Moreover, the Court of Appeals for the Second Circuit has twice declined to find RICO unconstitutionally vague since *H.J. Inc. See United States v. Coonan*, 938 F.2d 1553, 1562 (2d Cir.1991), *cert. denied*, 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992); *United States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir.) ("We have previously found that RICO was not unconstitutionally vague in a variety of applications ... and we so find here, notwithstanding the comments in the concurring opinion in *H.J., Inc.*") (citations omitted), *cert. denied*, 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991). Other circuits which have addressed the issue in the wake of *H.J. Inc.* have also rejected vagueness challenges to RICO. *See, e.g., United States v. Bennett*, 984 F.2d 597, 606–07 (4th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2428, 124 L.Ed.2d 649 (1993); *United States v. Dischner*, 974 F.2d 1502, 1508 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1290, 122 L.Ed.2d 682 (1993); *United States v. Glecier*, 923 F.2d 496, 497 n. 1 (7th Cir.), *cert. denied*, 502 U.S. 810, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991); *United States v. Woods*, 915 F.2d 854, 862–64 (3d Cir.1990), *cert. denied*, 499 U.S. 947, 111 S.Ct. 1413, 113 L.Ed.2d 466 (1991); *United States v. Angiulo*, 897 F.2d 1169, 1178–80 (1st Cir.), *cert. denied*, 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990). *See also United States v. Van Dorn*, 925 F.2d 1331, 1334 (11th Cir. 1991) (rejecting vagueness challenge in passing). *But see Firestone v. Galbreath*, 747 F.Supp. 1556, 1579–81 (S.D.Ohio 1990) (holding "pattern" requirement in RICO unconstitutionally vague), *aff'd on other grounds*, 976 F.2d 279 (6th Cir.1992), *modified*, 25 F.3d 323 (6th Cir.1994).

This court perceives no compelling reason to reject this overwhelming body of authority. Because the clearly-established law in this circuit is that RICO is not unconstitutionally vague, defendant Mahshie's motions are denied.

### C. PLAINTIFFS' CROSS–MOTION

Plaintiffs cross-move for judgment as a matter of law on that portion of the verdict addressing the first, second and third causes

---

jury intended to award a single punitive award of $950,000.

**6.** " 'If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not pass on questions of constitutionality ... unless such adjudication is unavoidable.' " *Zobrest v. Catalina Foothills School Dist.*, —— U.S. ——, —— – ——, 113 S.Ct. 2462, 2469–70, 125 L.Ed.2d 1 (1993) (Blackmun, J., dissenting) (quoting *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944)). This "fundamental rule of judicial restraint", *Three*

*Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering*, 467 U.S. 138, 157, 104 S.Ct. 2267, 2279, 81 L.Ed.2d 113 (1984), is a "corollary" to the Article III case or controversy requirement, *Rescue Army v. Municipal Court of Los Angeles*, 331 U.S. 549, 570, 67 S.Ct. 1409, 1420, 91 L.Ed. 1666 (1947), and finds its basis in the fundamental principles underlying the institution of judicial review and the judiciary's proper role in our federal system of government. *Zobrest*, —— U.S. at ——, 113 S.Ct. at 2470 (citing *Rescue Army*, 331 U.S. at 570, 67 S.Ct. at 1420).

of action. Plaintiffs assert that damages flowing from the fraud underlying those actions were fixed in the first trial at $1,930,-500, and that defendant is collaterally estopped from relitigating the amount of damages. The court disagrees.

Under the doctrine of collateral estoppel, a party may preclude an adversary from relitigating an issue of fact or law which has previously been decided against that adversary in a proceeding in which he had a fair opportunity to fully litigate the issue. *Staffer v. Bouchard Transp. Co.,* 878 F.2d 638, 644 (2d Cir.1989); *Rubel v. Eli Lilly & Co.,* 681 F.Supp. 151, 153 (S.D.N.Y.1987) (applying New York law of collateral estoppel). For collateral estoppel to apply, the issue in question must be identical to the issue already tried and decided. *Thistlethwaite v. City of New York,* 497 F.2d 339, 341–42 (2d Cir.), *cert. denied,* 419 U.S. 1093, 95 S.Ct. 686, 42 L.Ed.2d 686 (1974).

The purpose of collateral estoppel is to preclude the repeated controversy over matters once judicially determined. *Lytle v. Household Mfg. Inc.,* 494 U.S. 545, 553, 110 S.Ct. 1331, 1337, 108 L.Ed.2d 504 (1990). It is "a reasonable measure calculated to save individuals and courts from the waste and burden of relitigating old issues." *Tillman v. Nat'l City Bank of New York,* 118 F.2d 631, 634 (2d Cir.), *cert. denied,* 314 U.S. 650, 62 S.Ct. 96, 86 L.Ed. 521 (1941). It also serves to obviate the "unsavory situation of inconsistent verdicts." *In re Air Crash Disaster at John F. Kennedy Int'l Airport,* 479 F.Supp. 1118, 1128 (E.D.N.Y.1978).

In the instant case the doctrine of collateral estoppel did not preclude the court from submitting the issue of damages to the jury because the issue of damages as to defendant Mahshie was not decided by the first jury. While that jury found in its general verdict that Abou–Khadra and/or SPPI owed Bseirani $1,930,500 relating to Bseirani's business dealings with SPPI, the jury never specified what portion of that overall amount was owed by defendant Mahshie. For instance, after finding that Mahshie was liable for conspiring to acquire from Bseirani a 49 percent interest in SPPI, the jury was asked what amount of damages resulted.

The jury responded that the damages relating to Mahshie "are included in" the $1,930,-500 general verdict. Transcript, Doc. 235, at 20. The jury gave an identical response when asked to enumerate the damages on the other causes of action against Mahshie. *See* Transcript, Doc. 235, at 21 (relating to question 15; conspiracy to defraud Bseirani into believing he was an owner of CSE), at 23 (relating to question 26; conspiracy to acquire 49 percent interest in SPPI), and at 25 (relating to question 35; conspiracy to conduct the Abou–Khadra/Bseirani business venture). Because the first jury failed to put a sum certain on the damages owed by Mahshie, the issue of damages owed by Mahshie was not "decided" in a previous proceeding, and the previous determinations did not collaterally estop the court from submitting the issue of damages to the second jury.

Further, the first jury did not apportion its general verdict of $1,930,500 arising out of "business dealings in connection with SPPI" among the several causes of action relating to SPPI. Thus plaintiffs' argument that Mahshie's liability was determined by the first trial because he is jointly and severally liable as a co-conspirator must fail, in that it is impossible to determine the amount of damages awarded for any particular conspiracy claim. Therefore, plaintiffs' motion for partial judgment as a matter of law is denied.

### CONCLUSION

In summary, defendant's motions for judgment as a matter of law or a new trial, or in the alternative to limit the compensatory damages awarded by the jury to $237,500 are denied. Plaintiffs' cross-motion to modify the verdict is also denied. The Clerk of the Court is directed to enter judgment consistent with this Memorandum–Decision and Order.

It is So Ordered.